GREGORY A. BROWER, ESQ.
Nevada Bar No. 5232
gbrower@bhfs.com
ZACHARY R. MEYER, ESQ.
Nevada Bar No. 15783
zmeyer@bhfs.com
Brownstein Hyatt Farber Schreck, LLP
100 North City Parkway, Suite 1600
Las Vegas, Nevada 89106
Telephone: 702.382.2101
Facsimile: 702.382.8135

MIRANDA KANE *(pro hac vice)*
California Bar No. 150630
mkane@conmetkane.com
JORDAN DICKSON *(pro hac vice)*
California Bar No. 324406
jdickson@conmetkane.com
CONRAD | METLITZKY | KANE LLP
217 Leidesdorff Street
San Francisco, California 94111
Telephone: 415.343.7100
Facsimile: 415.343.7101

Attorneys for PAULINO GONZALEZ

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>PAULINO GONZALEZ,<br><br>Defendant. | CASE NO. 2:25-cr-00179-RFB-BNW<br><br>**MOTION TO WITHDRAW GUILTY PLEA AND SET ASIDE WAIVER OF INDICTMENT**<br><br>(Hearing Requested the Week of June 22, 2026) |

## I. INTRODUCTION

Paulino Gonzalez only pled guilty because his prior counsel wrongly told him that the government did not have to prove his actual intent to commit fraud. Mr. Gonzalez relied on his attorney for advice on how to proceed, but his attorney incorrectly advised Mr. Gonzalez that the government could meet its burden just by showing he received money from his alleged co-conspirators. His attorney was wrong. His attorney also failed to review or even ask for any pre-indictment discovery before advising Mr. Gonzalez that the government had sufficient evidence to meet its burden. As a result of this ineffective assistance, Mr. Gonzalez believed he had no choice but to plead guilty. So, he did. Mr. Gonzalez's plea was marred by bad legal advice and a lack of understanding about the government's evidence against him. Because his prior counsel provided ineffective assistance, the Court should find that it is fair and just to grant Mr. Gonzalez's motion to withdraw his plea.

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. <u>Relevant Background</u>

Paulino Gonzalez knew very early that he wanted to dedicate his life to helping others. Gonzalez Decl. ¶ 4.[1] He graduated high school at sixteen and was the first in his family to get an advanced degree. He was just eighteen years old when he became a Licensed Practical Nurse ("LPN") in 2003. *Id.* ¶ 3. Over the course of more than twenty years, he built a career as a skilled wound care specialist, primarily providing home healthcare. *Id.* ¶ 5. His dream was to become a doctor. *Id.* ¶ 4. He graduated from Universidad Autónoma de Guadalajara School of Medicine in 2016, and has taken and passed two of the three licensing examination pre-requisites to apply for a residency. *Id.* Mr. Gonzalez was in the process

[1] Mr. Gonzalez does not intend a general waiver of either the attorney-client privilege or his privilege against self-incrimination by submitting a declaration in support of this motion. To the extent the present motion creates a limited waiver of attorney-client privilege, such a waiver must be strictly limited to **only** communications between himself and his prior counsel related to (1) explanation of the elements of the offense, and (2) discovery sought from the government or reviewed with Mr. Gonzalez. *See generally United States v. Markanson*, No. 2:18-CR-00024-TLN, 2025 WL 601592 (E.D. Cal. Feb. 25, 2025); *cf. Bittaker v. Woodford*, 331 F.3d 715, 720 (9th Cir. 2003) (en banc) ("The court must impose a waiver no broader than needed to ensure the fairness of the proceedings before it. Because a waiver is required so as to be fair to the opposing side, the rationale only supports a waiver broad enough to serve that purpose. Courts, including ours, that have imposed waivers under the fairness principle have therefore closely tailored the scope of the waiver to the needs of the opposing party in litigating the claim in question."). Mr. Gonzalez reserves the right to oppose any effort by the government to access attorney-client privileged communications or pierce his privilege against self-incrimination.

of preparing for the final licensing examination when law enforcement first contacted him in connection with this matter. *Id.* If Mr. Gonzalez were to be convicted, he may never be able to obtain his medical license. *Id.*

Mr. Gonzalez remains passionate about his commitment to patient care; he has always prioritized making personal connections with the patients to whom he provides care. *Id.* ¶ 5. He also finds immense satisfaction in his ability to devise effective treatment plans to ease patients' pain and further their healing. *Id.* Mr. Gonzalez was on the frontline of medical care during the Covid-19 pandemic—often working eighty hours per week to take care of those in need. *Id.* He also volunteered his time on medical mission trips to El Salvador, Haiti, and Guatemala to provide medical treatment to people who did not have ready access to health care services. *Id.* ¶ 8.

Mr. Gonzalez remained actively engaged in nursing work through June 2025, when the Department of Justice publicly announced his guilty plea as part of a national "record-setting Health Care Fraud Takedown" involving cases across fifty federal districts at a press conference showcasing the United States Attorney General. **Ex. A.** Following that announcement, Mr. Gonzalez has been unable to obtain employment as a nurse. Gonzalez Decl. ¶ 9. In February 2026, he voluntarily placed his nursing license on inactive status. *Id.* To date, the government has not charged his alleged co-conspirators, Sales Representative 1 or Doctor 1, with any crime. Kane Decl. ¶ 19.

Now forty-one years old, Mr. Gonzalez lives a relatively quiet life in Las Vegas, Nevada. Gonzalez Decl. ¶ 2. Although they divorced when he was ten, Mr. Gonzalez remains close to his parents and his two younger siblings. *Id.* ¶ 3. Mr. Gonzalez finds solace and purpose in his deeply held faith, which served as a catalyst for him to dedicate his time and resources to starting a non-profit organization devoted to bettering the lives of immunocompromised individuals. *Id.* ¶ 8.

### B. <u>The Government's Investigation</u>

On January 16, 2025, federal agents approached Mr. Gonzalez at his home In Las Vegas. *Id.* ¶ 10. Mr. Gonzalez agreed to speak to them without counsel, unaware that the agents were covertly recording their almost two-hour conversation. Kane Decl. ¶ 2. At the outset of the interview, agents told Mr. Gonzalez that the interview was "about wound care in general." *Id.* He did not understand that he was a potential target of the investigation. Gonzalez Decl. ¶ 10. After speaking with a friend about his encounter

with federal agents, Mr. Gonzalez hired counsel to assist him. *Id.* ¶ 11. Tellingly, prior counsel asked Mr. Gonzalez to sign a flat-fee arrangement through plea negotiations only. *Id.*

On January 27, 2025, still believing that he was merely assisting the government's investigation, Mr. Gonzalez sat for a proffer with the government and his prior counsel. *Id.* ¶ 12. Throughout January and February 2025, with the assistance of prior counsel, Mr. Gonzalez gathered and produced communications and records in response to a grand jury subpoena issued by the government on January 27, 2025. *Id.* ¶ 13. Mr. Gonzalez made no admissions that he engaged in a criminal conspiracy or that he intended to help accomplish the objects or unlawful goals of any conspiracy during his meetings with the government or through the documents he produced. Kane Decl. ¶ 6. To the contrary, Mr. Gonzalez repeatedly expressed his commitment to patient care and his sincere belief that the allografts ordered by Doctor 1 were an effective treatment option. *Id.*

From the date agents approached him until April 2025, Mr. Gonzalez did not understand or believe that he was the subject or target of a government investigation. Gonzalez Decl. ¶ 14. His prior counsel never advised him otherwise. *Id.* Instead, his prior counsel recommended that Mr. Gonzalez should "cooperate" and be honest with the government. *Id.* Up until April 2025, Mr. Gonzalez's prior counsel did not advise Mr. Gonzalez that "cooperating" with the government meant that he would be required to plead guilty to a crime. *Id.* ¶¶ 14–15.

### C. Prior Counsel's Flawed Advice Regarding the Government's Plea Offer

On April 16, 2025, Mr. Gonzalez's counsel sent a text message to Mr. Gonzalez asking to meet with him to "review the plea agreement and cooperation agreement." **Ex. B** at 6. When Mr. Gonzalez and his prior counsel met later that week, his counsel advised him that it would be in Mr. Gonzalez's interest to agree to plead guilty and continue to cooperate. Gonzalez Decl. ¶ 15. Following the meeting, Mr. Gonzalez still had questions regarding the plea agreement. *See* **Ex. B** at 8. Prior counsel did not address Mr. Gonzalez's questions and responded instead with copied and pasted requests from the government concerning how Mr. Gonzalez might be able to cooperate against others. *See id.* at 8–10. The following day, Mr. Gonzalez asked his prior counsel to send him the plea offer and noted that their meeting to discuss the contours of the plea offer "felt . . . a little rushed." *Id.* at 10. Prior counsel texted Mr. Gonzalez a copy of the plea agreement, and the two arranged a call to discuss. *Id.* at 11–13.

During that call, Mr. Gonzalez expressed discomfort with proceeding with the plea. Gonzalez Decl. ¶ 16. Mr. Gonzalez explained to his prior counsel that he did not believe he had ever agreed to join a conspiracy and did not believe the government could show that he possessed any intent to enter into or promote the goals of any unlawful conspiracy. *Id.* Unable to reconcile his prior counsel's recommendation with his understanding of the government's evidence, Mr. Gonzalez consulted ChatGPT in order to learn more about how his lack of intent and lack of knowing involvement might be relevant to defending against the government's allegations. *See id.* ¶ 17. Mr. Gonzalez texted his prior counsel with information he had obtained from ChatGPT. **Ex. B** at 13–15. His counsel did not respond by text but later told Mr. Gonzalez that ChatGPT's information was wrong. Gonzalez Decl. ¶ 17. Subsequently, on May 1, 2025, Mr. Gonzalez and his prior counsel had another virtual proffer meeting with the government. Kane Decl. ¶ 7. Again, Mr. Gonzalez made no admissions that he engaged in a criminal conspiracy or that he intended to help accomplish the objects or unlawful goals of any conspiracy during that proffer. *Id.* His prior counsel assured Mr. Gonzalez that he "did amazingly well" during the proffer. *See* **Ex. B** at 18.

When Mr. Gonzalez spoke to his prior counsel in the weeks that followed, he reiterated that he did not believe the government could prove he had committed a crime because he did not knowingly enter into any conspiratorial agreement or intend to help accomplish the goals of any conspiracy that may have existed between Doctor 1 and Sales Representative 1. Gonzalez Decl. ¶ 18. On May 15, 2025, the government presented its evidence to Mr. Gonzalez and his prior counsel at a reverse proffer meeting over Zoom. *See* **Ex. C**. During the same meeting, Mr. Gonzalez also made statements in response to questions asked by the government. Kane Decl. ¶ 7. Mr. Gonzalez made no admissions that he engaged in a criminal conspiracy or that he intended to help accomplish the objects or unlawful goals of any conspiracy during that proffer. *Id.* Following the reverse proffer, Mr. Gonzalez and his prior counsel had a phone conversation. Gonzalez Decl. ¶ 19. Prior counsel told Mr. Gonzalez that in his assessment both Sales Representative 1 and Doctor 1 were going to go to jail for a long time and said that their sentences could be up to twenty years of imprisonment. *Id.* ¶ 20. Prior counsel told Mr. Gonzalez that if he did not agree to plead guilty and cooperate, he would be "grouped in" with Sales Representative 1 and Doctor 1. *Id.* Mr. Gonzalez took this to mean he would, as a matter of law, receive the same sentence as Sales

Representative 1 and Doctor 1 if he proceeded to trial. *Id.* Prior counsel analogized Mr. Gonzalez's conduct to that of a taxi driver who drives a person to the bank that person plans to rob. *Id.* ¶ 21. According to his prior attorney, the taxi driver would be responsible for the bank robbery itself. *Id.* Mr. Gonzalez followed his counsel's advice, not understanding the glaring absence of requisite mens rea from that analogy, and reluctantly agreed to plead guilty. *Id.* ¶¶ 24–27.

A month later, on Thursday, June 12, 2025, the government sent Mr. Gonzalez's counsel a finalized plea agreement. *See* **Ex. D**. The government postured that it was "on a tight timeline" and said the plea offer expired six days later, on June 18, 2025. *See id.* The government did not reveal that the Department of Justice was orchestrating a press splash regarding a national health care fraud takedown featuring the United States Attorney General; however, that arbitrary June 18 deadline was just twelve days before the Attorney General's press release. Kane Decl. ¶ 20. Prior counsel forwarded the plea agreement to Mr. Gonzalez on June 12, 2025, and suggested a meeting on June 16 or June 17, just days before the deadline. *See* **Ex. E**. They met on June 16, 2025. Gonzalez Decl. ¶ 23. Mr. Gonzalez's prior counsel spent only a fraction of the hour-long meeting going through the plea offer and explaining what the government would be required to prove if Mr. Gonzalez rejected the plea and took his case to trial. *Id.* During that meeting, prior counsel incorrectly explained that if the government could show money from Sales Representative 1 went into Mr. Gonzalez's bank account, that would be sufficient to prove Mr. Gonzalez's criminal intent to engage in the charged crime. *Id.* ¶ 24.

### D. <u>The Recorded Meeting</u>

Mr. Gonzalez and prior counsel met in person on June 20, 2025, for what Mr. Gonzalez assumed would be their last meeting before the scheduled change of plea hearing on June 26, 2025 (the "Meeting"). Gonzalez Decl. ¶ 26. Mr. Gonzalez surreptitiously recorded most of the Meeting. **Ex. F**.[2] While Mr. Gonzalez recognized that recording a meeting with one's counsel was an unusual step, Mr. Gonzalez knew that the Meeting was likely going to be his last conversation with his counsel before he made a decision about the government's plea offer. Gonzalez Decl. ¶ 26. Still questioning the propriety of pleading guilty

[2] **Exhibit F** is a transcript of the portion of the meeting relevant to the issues raised in the present motion. The recording will be provided to the government at the time of this filing and is available to the Court should it want a copy.

when he did not believe the government could prove he had the intent to engage in a criminal conspiracy, Mr. Gonzalez wanted to have a recording of the meeting so that he could re-listen to his counsel's advice and explanation of what exactly the government had to prove. *Id.* At this point, Mr. Gonzalez had not lost trust in his counsel. *Id.* The recording was intended as a reference that he could consult as needed to assist in his understanding. *Id.*

During the Meeting, counsel minimized the requisite proof required, explaining:

> You know, when it comes down to this. The easiest thing for them to prove is, I mean, and that's the thing—they don't have to prove that you're a bad person here, you're not. I don't even think [Sales Representative 1 is] a bad person. I mean I think you guys helped a lot of people, okay? **The problem with the kickbacks is, is just receiving it. That is—and whether you thought it was a kickback or not—there's no getting around that. <u>All they have to do is prove the money went into your account. And that's it.</u>**

**Ex. F** at 2–3 (1:33–2:02). Counsel went on to say,

> Um, I think, like I said, the easiest thing for them is the kickbacks. **And even your intent, even if you never thought it was a kickback. That's the frustrating thing.** Because you know, at one point he even asked you, "Hey, is this legit?" . . . Anyway, but it, you know, they don't have to prove you're a bad person, is what it comes down to.

*Id.* at 5–6 (6:02–6:50). Mr. Gonzalez's response reveals that he was putting his faith in his counsel's advice:

> You know, I pray a lot about you. To God, "Do I have the right person representing me?" I really do think- I think there's just signs along the way that have reassured me of that . . . And I think that's what I've been doing. I've just been overthinking every single scenario and, you know, and, you know, I have to trust.

*Id.* at 6–7 (6:56–9:16).

Had Mr. Gonzalez understood that the government would have been required to prove that he had the requisite intent to engage in a crime and that the government would have had to prove more than just that Mr. Gonzalez received money into his bank account—under any charge that it could cognizably bring—he would not have agreed to plead guilty. Gonzalez Decl. ¶ 24.

**E. <u>Prior Counsel's Failure to Request or Review the Government's Evidence</u>**

During the May 15, 2025 reverse proffer, the government used the share screen function to show Mr. Gonzalez and his prior counsel (1) checks and bank statements showing Mr. Gonzalez received money from Doctor 1 and Sales Representative 1; (2) messages between Doctor 1 and Sales Representative 1;(3) a handful of patient files including notes on the patients and the size of the allograft applied to a patient's wound; and (4) rebates managed by Doctor 1. Gonzalez Decl. ¶ 19. Mr. Gonzalez's prior counsel did not request or receive any further discovery from the government, nor did he request copies of the selected documents presented during the virtual reverse proffer. Kane Decl. ¶ 27. Prior counsel explained, "Because we negotiated Paulino's case before charges were filed as a cooperator, I was not given copies of the discovery. However, AUSA Monica Cooper provided us enough information including a reverse proffer showing the evidence to prosecute Paulino's case if he rejected the plea[.]" *See* **Ex. G**. Prior counsel later confirmed again that "The only discovery they shared with us but didn't give us a copy was provided in the debrief and in the reverse proffer." *See* **Ex. H**.

Since undersigned counsel began representing Mr. Gonzalez, the government has shown and provided substantial amounts of discovery upon request. Kane Decl. ¶ 5. For example, the government has shown or provided counsel with recordings of Mr. Gonzalez's voluntary interview with agents, FBI 302s and notes from the proffer meetings described above, checks and bank statements showing money being paid to Mr. Gonzalez, emails to and from Mr. Gonzalez, Sales Representative 1, and Doctor 1, portions of witness interviews, financial records, and more. *Id*. Missing is any direct evidence that Mr. Gonzalez knew of or knowingly entered into an unlawful agreement with Sales Representative 1 or Doctor 1; that he acted with intent to further or accomplish the objectives of any unlawful conspiracy; that he recruited patients to whom allografts could be applied; or that he unilaterally made medical decisions to apply allografts or placed unnecessary orders for them. *See id*. ¶ 8. Indeed, the government has conceded that its proof of Mr. Gonzalez's intent is entirely circumstantial. *Id.* Following a fulsome reverse proffer with the government and his current counsel on February 4, 2025, Mr. Gonzalez felt that all his previous misgivings about the weaknesses of the government's case were confirmed. Gonzalez Decl. ¶ 30. Had his prior counsel requested and reviewed discovery with Mr. Gonzalez, Mr. Gonzalez plausibly could have decided not to enter a guilty plea. *Id*. ¶ 31.

**F. <u>The Change of Plea Hearing</u>**

On June 26, 2025, based on the erroneous advice provided by his counsel and his minimal information or understanding about the government's evidence against him, Mr. Gonzalez pled guilty to an Information charging him with a single count of conspiracy, in violation of 18 U.S.C. § 371. ECF Nos. 7, 12. As part of the pre-indictment negotiations, Mr. Gonzalez signed a waiver of indictment. ECF No. 5. At the change of the plea hearing, the Court accurately described the elements of the offense, and Mr. Gonzalez acknowledged that there was a factual basis to support the plea agreement. Kane Decl. ¶ 9; ECF No. 7; *see also* ECF No. 26 (Transcript of Plea Colloquy). But because of his counsel's incorrect advice, Mr. Gonzalez wrongly believed that the government could satisfy the first two elements of the charged conspiracy simply by showing he received money from Sales Representative 1 or Doctor 1, regardless of the government's evidence of knowledge or intent. Gonzalez Decl. ¶ 24. Based on the erroneous advice he received, Mr. Gonzalez admitted that he "knowingly and willfully conspired with others to defraud the United States and offer and pay kickbacks" and that as part of the conspiracy he was paid "approximately $7,391,584 in exchange for arranging for and recommending the purchasing and ordering of the allografts billed to Medicare." ECF No. 7 at 8–11. Mr. Gonzalez began to question his counsel's explanation during a conversation with a friend after he pled guilty. Gonzalez Decl. ¶ 29. Mr. Gonzalez told his friend that his attorney advised him that the government only had to prove that money entered his bank account, and the friend questioned whether that was actually true. *Id*.

**G. <u>Timing of the Present Motion</u>**

On August 17, 2025, Mr. Gonzalez formally engaged undersigned counsel and requested that prior counsel provide the complete case file to his new counsel. Kane Decl. ¶ 4. Over the next few weeks, prior counsel forwarded various communications he had with the government and documents he produced to the government on behalf of Mr. Gonzalez. *Id*. On September 10, 2025, undersigned counsel and the government had their first meeting to discuss case status and a continuance of the sentencing which was then set for October 2, 2025. *Id*. ¶ 10. On September 29, 2025, the Court granted, in part, the parties' stipulation to continue sentencing. ECF at 19. Since then, the parties have been in active dialogue regarding the case, including whether Mr. Gonzalez intended to move to withdraw his plea. Kane Decl. ¶ 10.

The Fraud Section attorney with whom prior counsel had negotiated the plea agreement was no longer at the Department of Justice when undersigned counsel began representing Mr. Gonzalez. *Id.* ¶ 11. On October 17, 2025, undersigned counsel spoke with a new prosecutor from the Fraud Section who indicated that he would be the primary point of contact for Mr. Gonzalez's case moving forward. *Id*. On November 13, 2025, undersigned counsel had a first meeting with the new Fraud Section prosecutor to discuss case status. *Id*. On November 18, 2025, the parties met, and the government described some of its evidence against Mr. Gonzalez. *Id*. ¶ 12. Over the next several weeks, Mr. Gonzalez and undersigned counsel discussed the contours of his case. *Id*. ¶ 13. On January 8, 2026, the parties met, and undersigned counsel informed the government that Mr. Gonzalez had decided to move forward with filing a motion to withdraw his plea. *Id*. ¶ 14. The following day, the government requested the opportunity to have further discussions with undersigned counsel before Mr. Gonzalez made a final decision about filing the instant motion. *Id*. On January 12, 2026, the parties met to continue discussions about Mr. Gonzalez's case. *Id*. ¶ 15. On January 16, 2026, the Court granted, in part, the parties' second stipulation to continue sentencing. ECF at 24.

On February 4, 2026, at the government's suggestion, attorneys from the Fraud Section and Mr. Gonzalez traveled to undersigned counsel's office in San Francisco for a reverse proffer. Kane Decl. ¶ 16. Thereafter, the government and undersigned counsel met virtually on February 26, 2026, and March 5, 2026, to discuss Mr. Gonzalez's case further. *Id*. ¶ 17. After their meeting, undersigned counsel began taking steps to draft and file the instant motion. *Id*.

To date, the U.S. Probation Office has not interviewed Mr. Gonzalez or prepared a draft presentence report. *Id*. ¶ 18.

## III. ARGUMENT

### A. <u>Mr. Gonzalez Has Demonstrated that it Would Be Fair and Just to Allow Him to Withdraw His Guilty Plea Based on Erroneous Legal Advice</u>

Mr. Gonzalez's prior counsel gave him fundamentally incorrect legal advice about a critical element of the government's case – his intent. Relying on that specious legal advice, Mr. Gonzalez accepted his counsel's explanation of the intent requirement when he read the written plea agreement and listened to the oral accounting of the elements during the plea colloquy. That alone is sufficient to

establish a fair and just reason for withdrawal. But in addition, his counsel failed to insist upon receiving and reviewing meaningful discovery before advising Mr. Gonzalez to plead guilty, further evincing counsel's ineffectiveness. Singularly or collectively, counsel's bad advice and failure to secure and review discovery are more than sufficient to establish a fair and just reason to permit withdrawal of Mr. Gonzalez's guilty plea. Consistent with the Ninth Circuit's liberal standard for a pre-sentence motion to withdraw a plea, the Court should grant Mr. Gonzalez's motion.

**1. Legal Standard**

Under Federal Rule of Criminal Procedure 11, a person may withdraw a guilty plea before sentencing for any "fair and just reason." Fed. R. Crim. P. 11(d)(2)(B). "Prior to sentencing, the proper inquiry is whether the defendant has shown a fair and just reason for withdrawing his plea even if the plea is otherwise valid." *United States v. Davis*, 428 F.3d 802, 806 (9th Cir. 2005); *see also United States v. Garcia*, 401 F.3d 1008, 1012 (9th Cir. 2005) ("[We have] squarely rejected the proposition that the fact that a plea is voluntary, knowing, and intelligent forecloses an attempt to withdraw it prior to sentencing."). The Ninth Circuit has consistently emphasized that the "fair and just reason" standard is "generous and must be applied liberally." *See, e.g.*, *United States v. McTiernan*, 546 F.3d 1160, 1167 (9th Cir. 2008); *United States v. Ortega-Ascanio*, 376 F.3d 879, 882–83 (9th Cir. 2004). District courts must interpret the fair and just standard "broadly" and are required to "freely allow withdrawal anytime the defendant provides 'any . . . reason for withdrawing the plea that did not exist when the defendant entered his plea.'" *United States v. Hernandez*, 105 F.4th 1234, 1238 (9th Cir. 2024) (quoting *McTiernan*, 546 F.3d at 1167). The Ninth Circuit has found that "[e]rroneous or inadequate legal advice . . . even without a showing of prejudice" is an adequate basis for granting a motion to withdraw a guilty plea. *McTiernan*, 546 F.3d at 1167.

The individual moving to withdraw his plea bears the burden of establishing that there is a fair and just reason to permit withdrawal. *United States v. Nostratis*, 321 F.3d 1206, 1208 (9th Cir. 2003). "When the basis for withdrawal is erroneous or inadequate legal advice, the defendant's burden is . . . to show that proper advice 'could have at least plausibly motivated a reasonable person in [the defendant's] position not to have pled guilty had he known about the [grounds for withdrawal] prior to pleading.'" *United States v. Abordo*, No. 24-2093, 2025 WL 2992350, at *1 (9th Cir. Oct. 24, 2025) (quoting *United*

*States v. Mayweather*, 634 F.3d 498, 504 (9th Cir. 2010)). If a person can show that such erroneous legal advice could have plausibly motivated a person's decision to plead guilty, "[n]othing in Rule 11(d)(2)(B) requires a defendant to show more in order to satisfy the 'fair and just reason' standard." *McTiernan*, 546 F.3d at 1167. "The person need not show that a legal argument foregone as a result of incorrect or incomplete advice would have been successful on its merits." *Mayweather*, 634 F.3d at 505 (internal quotation marks and citations omitted).

**2. Prior Counsel's Advice to Mr. Gonzalez was Legally Incorrect**

Mr. Gonzalez trusted his prior counsel's faulty legal analysis regarding the government's necessary proof. Unfortunately for Mr. Gonzalez, his prior counsel improperly explained, **"All they have to do is prove the money went into your account. And that's it." Ex. F** at 2–3 (1:33–2:02). His prior counsel further entrenched in Mr. Gonzalez's mind that his actual intent was irrelevant: "The problem with the kickbacks is, is just receiving it. That is—and whether you thought it was a kickback or not—there's no getting around that . . . Um, I think, like I said, the easiest thing for them is the kickbacks. And even your intent, even if you never thought it was a kickback. That's the frustrating thing." *Id.* at 2–3 (1:33–2:02); 5–6 (6:02–6:50). Prior counsel's explanation erroneously suggested that conspiracy to defraud the United States and pay or receive healthcare kickbacks is analogous to a strict liability offense where proof that a person received money means the person is guilty of the crime. That, of course, is not correct. It is not a correct explanation of the law of conspiracy or of any crime that defense counsel could have cognizably been discussing. *See* Ninth Circuit Model Criminal Jury Instructions 15.42 (Health Care Fraud); 24.25 (Soliciting or Receiving Kickbacks).

The fact that the elements of a conspiracy to defraud the United States and to pay and receive healthcare kickbacks were properly laid out in Mr. Gonzalez's plea agreement and repeated verbally during his plea colloquy cannot save prior counsel's inadequate advice. *Compare* ECF No. 7 at 5 *with* Ninth Circuit Model Criminal Jury Instructions 11.1, 11.2; *see also* ECF No. 26 at 9–11. The task of explaining what it means to become a member of a conspiracy, what it means to intend to help accomplish one of its objects, and what kind of evidence the government would have to show to establish those elements, falls squarely on defense counsel. *See Bradshaw v. Stumpf*, 545 U.S. 175, 183 (2005) ("[W]e have never held that the judge must himself explain the elements of each charge to the defendant . . .

Where a defendant is represented by competent counsel, the court usually may rely on that counsel's assurance that the defendant has been properly informed of the nature and elements of the charge to which he is pleading guilty."). Indeed, the Ninth Circuit Model Jury Instructions even lighten defense counsel's load considerably by providing explanations of the elements and contours of required proof. *See, e.g.*, Ninth Circuit Model Criminal Jury Instructions 11.2 ("For a conspiracy to have existed, it is not necessary that the conspirators made a formal agreement or that they agreed on every detail of the conspiracy. It is not enough, however, that they simply met, discussed matters of common interest, acted in similar ways, or perhaps helped one another."); *id.* ("On the other hand, one who has no knowledge of a conspiracy, but happens to act in a way which furthers some object or purpose of the conspiracy, does not thereby become a conspirator. Similarly, a person does not become a conspirator merely by associating with one or more persons who are conspirators, nor merely by knowing that a conspiracy exists.").

Here, Mr. Gonzalez's prior counsel's erroneous explanation of the intent requirement irrevocably doomed the legitimacy of Mr. Gonzalez's guilty plea.

**3. It is Plausible that a Reasonable Person Properly Advised Regarding the Elements of Conspiracy May Not have Pled Guilty**

It is plausible that a reasonable person could have chosen not to plead guilty if he had been properly advised that merely receiving money from an alleged co-conspirator was not sufficient to prove the intent necessary to satisfy the government's burden of proof beyond a reasonable doubt. Under *McTiernan*, the relevant inquiry is only whether proper advice "**could have at least plausibly** motivated a reasonable person in [Mr. Gonzalez's] position not to have pled guilty." 546 F.3d at 1168 (emphasis added). In *McTiernan*, the court vacated the district court's order denying a motion to withdraw, finding that there was nothing "inherently implausible" about the proposition that a reasonable person would not have pled guilty had he been properly advised that there was a possibility of pursuing a suppression motion. *Id*. at 1167–69. Similarly, in *United States v. Rojas Osorio*, No. 17-CR-00507-LHK-1, 2018 WL 6069935, at *4 (N.D. Cal. Nov. 20, 2018), the court held that it was plausible that a reasonable person would not have pled guilty had he been advised about new case law prior to entering his plea. *Id*.

Here, it is undoubtedly plausible that someone similarly situated to Mr. Gonzalez could have decided not to plead guilty had he received proper legal advice. Mr. Gonzalez repeatedly questioned the

government's contention that he knowingly participated in any crime and, specifically, expressed his doubts that the government could prove his intent to commit any crime to his prior counsel. *See generally* Gonzalez Declaration; **Ex. B.** But his attorney quashed those questions and doubts by explaining—incorrectly—that all the government had to do was prove money went into Mr. Gonzalez's bank account and that it did not matter "even if you never thought it was a kickback." **Ex. F** at 5–6 (6:02–6:50). Whether that incorrect advice was the result of a flippant choice of language or a lack of familiarity with the pertinent law, the effect on Mr. Gonzalez is undeniable. Any person in his position could have plausibly believed prior counsel's advice, as Mr. Gonzalez did. It is equally plausible that in the absence of these incorrect statements by counsel that a reasonable person may have rejected the plea offer and continued to challenge the government's flimsy evidence.

### B. Mr. Gonzalez Has Demonstrated that it Would Be Fair and Just to Allow Him to Withdraw His Guilty Plea Based on Prior Counsel's Failure to Seek and Review the Government's Evidence Before Advising Mr. Gonzalez to Plead Guilty

Prior counsel's failure to request and review meaningful discovery before advising him to enter a plea is another, independent, fair and just reason to permit Mr. Gonzalez to withdraw his plea. Although there is no constitutional or statutory right to pre-indictment discovery, even when a person is considering pleading guilty before indictment, the Supreme Court has recognized that, "Of course, the more information the defendant has, the more aware he is of the likely consequences of a plea, waiver, or decision, and the wiser that decision will likely be." *United States v. Ruiz*, 536 U.S. 622, 629 (2002). Indeed, in *United States v. Miller*, No. 3:17-cr-00063-TMB-DMS-2, 2021 WL 189140, at *5–*6 (D. Alaska Jan. 19, 2021), the court found it was fair and just to permit the charged person to withdraw his plea when his counsel failed to adequately advise him about the scope and details of recorded jail calls that had been included in the government's discovery productions. *Id*. The court reasoned,

> A reasonable person would plausibly want to know the full extent to which these attorney-client calls were recorded, listened to, or otherwise compromised, prior to entering into a guilty plea. Had Miller known about these 19 calls, he would have been able to discuss them with [counsel] and evaluate whether there was any basis to bring a Sixth Amendment

> challenge or pursue other legal recourse. Unfortunately, due to [counsel's] inadequate representation, Miller never had the chance to do so.

*Id*. at *6. Here, the record reveals that prior counsel urged Mr. Gonzalez to accept the government's plea in April 2025, before seeing any of the government's evidence at a reverse proffer some weeks later. Gonzalez Decl. ¶ 15. Prior counsel did not request copies of the materials presented by Zoom nor did he press for additional evidence, including any accounting of the methodology employed to reach an alleged loss figure of greater than $54 million, despite Mr. Gonzalez continuing to express reservations regarding the strength of the government's proof of intent.

Prior counsel admitted that "[t]he only discovery they shared with us but didn't give us a copy was provided in the debrief[3] and in the reverse proffer." *See* **Ex. H**. During the May 15, 2025 virtual reverse proffer, the government showed Mr. Gonzalez and his counsel (1) checks and bank statements showing Mr. Gonzalez received money from Doctor 1 and Sales Representative 1, (2) messages between Doctor 1 and Sales Representative 1, (3) a handful of patient files including notes describing the size of the allograft applied to a patient's wound, and (4) rebates managed by Doctor 1.[4] Gonzalez Decl. ¶ 19.

Prior counsel's discovery-related deficiencies create a fair and just reason to permit plea withdrawal for three reasons. First, prior counsel advised Mr. Gonzalez that it would be in his interest to plead guilty **before** he had seen any presentation of the government's evidence. Even if prior counsel were able to surmise what some of the government's evidence was based on its questions during the January 27, 2025 proffer, prior counsel had not, at that point, seen or received any discovery from the government. His advice to Mr. Gonzalez in April 2025 was speculative, at best. It is plausible that a reasonable person could have decided not to plead guilty had they understood that their counsel's initial advice was not grounded in analysis of the government's actual evidence.

Second, there is no indication that prior counsel insisted upon seeing or receiving more evidence than was shown to him during the May 2025 virtual reverse proffer. The government has been willing to

---

[3] Undersigned counsel assumes that the term "debrief" refers to the January 27, 2025 proffer. There is no indication in the materials undersigned counsel has received from the government or in any communications with prior counsel that there is a different meeting that could have been considered a debrief.

[4] Notably, the government did not suggest then, nor has it suggested since that Mr. Gonzalez was involved in Doctor 1's alleged rebate conspiracy. The loss attributed to Mr. Gonzalez in the plea agreement is based solely on the conspiracy to commit health care fraud.

share substantial amounts of discovery with undersigned counsel, including recordings of Mr. Gonzalez's interview with agents, checks and bank statements, emails and communications to and from Mr. Gonzalez, excerpts from witness interviews, financial records, and more. Kane Decl. ¶ 5. A thorough review of this kind of discovery could plausibly alter a reasonable person's view of the government's proof and the propriety of pleading guilty. For example, Mr. Gonzalez's recorded interview with agents evinces a dedicated wound care nurse who, in counsel's opinion, comes across as open and forthright about his relationship with Sales Representative 1 and Doctor 1 and the money he earned from his work with each of them. *Id*. ¶ 2. It is plausible that a reasonable person may have decided not to plead guilty if he had the benefit of hearing that recording and counsel's assessment about how damaging (or not) those recorded statements might be. Likewise, the excerpts from witness interviews that were shared with undersigned counsel revealed the absence of any direct evidence that Mr. Gonzalez was independently responsible for medical decision-making regarding the use of allografts. *Id*. ¶ 5. It is plausible that a reasonable person may have decided not to plead guilty if his counsel had asked for, reviewed, and assessed the quality and credibility of potential witness testimony prior to advising his client to accept a plea offer. But Mr. Gonzalez's prior counsel did neither.

Third, after the reverse proffer in May 2025, Mr. Gonzalez's prior counsel did not take the time to meaningfully review the limited evidence presented with Mr. Gonzalez. Gonzalez Decl. at ¶ 19. Instead, Mr. Gonzalez and his prior counsel had a phone conversation. *Id*. Prior counsel told Mr. Gonzalez that in his assessment both Sales Representative 1 and Doctor 1 were going to go to jail for a long time and said that their sentences could be up to twenty years of imprisonment. *Id*. ¶ 20.[5] Prior counsel told Mr. Gonzalez that if he did not agree to plead guilty and cooperate he would be "grouped in" with Sales Representative 1 and Doctor 1. *Id*. Mr. Gonzalez took this to mean he would, as a matter of law, receive the same sentence as Sales Representative 1 and Doctor 1 if he proceeded to trial. *Id*. Prior counsel told Mr. Gonzalez that a pertinent analogy for Mr. Gonzalez's conduct was that a taxi driver who drives a person to a bank that the person subsequently robs is responsible for the bank robbery itself. *Id*. ¶ 21. Ten months later, neither Sales Representative 1 nor Doctor 1 have been charged for their participation in the

[5] Prior counsel did not explain that 20 years was the statutory maximum and that under the Sentencing Guidelines, the actual sentence would likely be significantly less.

alleged conspiracy. Had prior counsel spent time with Mr. Gonzalez and fully considered his responses to the government, Mr. Gonzalez may not have proceeded with his plea. In any event, it is certainly plausible that a reasonable person could have decided not to plead guilty if counsel had listened to his client's critiques of the government's evidence. Because of prior counsel's failure to insist on *any* discovery, it would be fair and just for the Court to permit Mr. Gonzalez to withdraw his plea.

### C. <u>Mr. Gonzalez's Motion to Withdraw His Plea is Made in Good Faith</u>

Nothing about the circumstances of Mr. Gonzalez's motion to withdraw his plea suggests anything other than a good faith, genuine belief that allowing him to withdraw his guilty plea is a fair and just outcome. The Court should not exercise its discretion to deny his motion based on a finding that it is pretextual. The facts demonstrate that Mr. Gonzalez relied on his counsel's misguided advice to overcome his misgivings regarding the merits of the government's case. Moreover, there are no grounds to suggest that Mr. Gonzalez's stated reasons for seeking to withdraw his plea are not genuine. *See Hernandez*, 105 F.4th at 1239. Similarly, nothing in the record supports an ulterior motive, including cold feet or buyer's remorse. *See Nostratis*, 321 F.3d at 1211 (defendant's realization that his sentence would be higher than expected deemed not a good faith basis for motion to withdraw). And the timing of Mr. Gonzalez's motion raises no red flags. *See Garcia*, 401 F.3d at 1013 (timing of a motion to withdraw may be a "barometer of the defendant's candor . . . about his reasons for withdrawal.").

Mr. Gonzalez's good faith motivation is evidenced by the fact he is unlikely to gain a strategic advantage if he prevails in his effort to withdraw his guilty plea. To the contrary, the mere act of moving to withdraw his plea may jeopardize his ability to earn the leniency promised under the 5K1.1 provision in the current plea agreement. Without his admission to the charged conduct, the government will likely deem his value as a potential cooperator to be diminished. Likewise, if Mr. Gonzalez succeeds in this motion he expects that the government will pursue a superseding indictment against him that includes additional charges with higher maximum penalties. *See Hernandez*, 105 F.4th at 1240 (the fact that a defendant's "plea withdrawal request would have likely led to a *more severe* sentence, undercut[s] the inference that he is trying to game the system to avoid a harsh punishment."). The strategic risks associated with Mr. Gonzalez's decision to pursue this motion should assure the Court that it can trust that Mr. Gonzalez truly believes that his prior counsel misled him regarding the state of the law.

The timing of the motion does not alter that conclusion. Although Mr. Gonzalez pled guilty ten months ago, his qualms about the legitimacy of that plea arose almost immediately and were not in response to any indication from the U.S. Probation Office or the government regarding their ultimate sentencing recommendations. The U.S. Probation Office has not interviewed Mr. Gonzalez or prepared a presentence report. Kane Decl. ¶ 18; *see Hernandez* 105 F.4th at 1240 (holding five-month delay between change of plea and motion to withdraw not enough to establish gamesmanship where pre-sentence report had not yet issued). Mr. Gonzalez was sufficiently distressed about the circumstances of his plea—his failure to appreciate how he become a target when the government had previously treated him as a witness, the government's short timeline for him to consider the proposed plea agreement, his counsel's inability to answer all his questions—that he voiced his concerns with a friend soon after the plea hearing. Gonzalez Decl. *Id*. ¶ 29. When his friend also appeared troubled by Mr. Gonzalez's attorney's recitation of the offense elements, Mr. Gonzalez immediately sought alternative counsel. *See Id.*

As outlined in Section II-G, *supra*, over the next several months, undersigned counsel gathered information from Mr. Gonzalez's prior counsel, performed its own analysis and research, met with Mr. Gonzalez multiple times, and met with the government on several occasions. Importantly, Mr. Gonzalez communicated his final decision to move forward with filing a motion to withdraw his plea to the government in January 2026, just six-months after the change of plea hearing. Kane Decl. ¶ 14. But the government requested that Mr. Gonzalez further delay filing this motion to allow it to present an additional reverse proffer, which occurred on February 4, 2026. *Id*. ¶¶ 14–16. Overall, the delay between plea and motion is reasonable under the circumstances, and, more importantly, does not suggest any gamesmanship from Mr. Gonzalez.

### D. <u>The Court Should Set Aside Mr. Gonzalez's Waiver of His Right to Indictment</u>

If the Court grants Mr. Gonzalez's motion to withdraw his guilty plea, the Court should exercise its inherent supervisory power to protect the integrity of criminal proceedings, *see United States v. Hasting*, 461 U.S. 499, 505 (1983), and also set aside Mr. Gonzalez's waiver of indictment. Federal Rule of Criminal Procedure 7(b) permits the government to bring felony charges without seeking a valid indictment "if the defendant—in open court and after being advised of the nature of the charge and of the

defendant's rights—waives prosecution by indictment." Mr. Gonzalez's plea agreement and his waiver of indictment are fundamentally intertwined as they were presented as part of a single pre-indictment resolution proposal —they were executed on the same day, accepted by the Court during the same hearing, and explained to Mr. Gonzalez by the same counsel. *See* ECF Nos. 5, 7, 12. If the Court finds that Mr. Gonzalez has established that his prior counsel's erroneous legal advice constitutes a fair and just reason to withdraw his plea, the Court should find that the same deficient advice tainted Mr. Gonzalez's decision-making regarding the waiver of his right to an indictment. Doing so creates no prejudice to the government and properly puts Mr. Gonzalez in the same position he was in before he followed his prior counsel's poor advice.[6]

## IV. CONCLUSION

For all the reasons described above, the Court should conclude that Mr. Gonzalez has established that there is a fair and just reason to permit him to withdraw his plea. The Court should grant Mr. Gonzalez's motion.

DATED: April 29, 2026

Respectfully submitted,

CONRAD | METLITZKY | KANE LLP

*/s/ Miranda Kane*
MIRANDA KANE
JORDAN DICKSON
Attorneys for Paulino Gonzalez

[6] In any event, Mr. Gonzalez's waiver is limited to the single charge in the Information. If Mr. Gonzalez prevails in this motion and the government chooses to bring additional charges against him it will have to present a Superseding Indictment to a grand jury.